**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LESLIE BLAND O/B/O J.G., <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | Civil Action No. 15-2860 (JLL) <br><br><br> OPINION |

**LINARES**, District Judge.

This matter comes before the Court upon the appeal of Leslie Bland o/b/o J.G. ("Plaintiff") from the final decision of the Commissioner upholding the final determination by Administrative Law Judge ("ALJ") Dennis O'Leary denying Plaintiff's application for supplemental security income ("SSI") payments under the Social Security Act (the "Act"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g), and resolves this matter on the parties' briefs pursuant to Local Civil Rule 9.1(f). After reviewing the submissions of both parties, for the following reasons, the final decision of the Commissioner is affirmed.

**I.     BACKGROUND**

    **A.     Procedural History**

On November 17, 2011, Plaintiff filed an application for supplemental security income on behalf of the claimant, a child under age 18, alleging disability beginning November 1, 2009.

(R.[1] 60-61, 163-170.) Plaintiff's application was denied initially on March 1, 2012, and upon reconsideration on April 3, 2012. (R. 79-81, 83-85.) Thereafter, Plaintiff filed a written request for hearing on May 10, 2012 pursuant to 20 CFR 404.1429 *et seq.* (R. 86-88.) A hearing was held in May and September 2013 in Newark, New Jersey before the ALJ. (R. 9-27.) Both Claimant, a six-year-old child, and Plaintiff appeared and testified, and were represented by counsel. (*Id.*)

Following the hearing, the ALJ denied Plaintiff's application in a written decision dated October 9, 2013. (R. 12-24.) Plaintiff timely filed a request for review with the Appeals Council (R. 7-8), and the Appeals Council denied Plaintiff's request for review on February 25, 2015. (R. 2-4.) On April 22, 2015, Plaintiff commenced this action. (ECF No. 1.) Plaintiff filed a brief in support (ECF No. 7 ("Pl. Br.")) and Defendant filed a brief in opposition (ECF No. 10 ("Def. Br.")). A review of the docket reveals that Plaintiff did not file a reply brief.

**B.  Factual History**

1. Plaintiff's Self-Reported Background

Plaintiff, Claimant's mother, claims that the child became disabled on November 1, 2009. (R. 172.) At that time, Claimant was in pre-school. Plaintiff alleged disability Attention Deficit Hyperactivity Disorder ("ADHD") Plaintiff later elaborated that this included getting into fights, inability to concentrate or "stay still," and a very limited attention span that impaired his ability to function in school. (R. 32.)

Plaintiff filled out a "Function Report – Child Age 3 to 6" in November 2011. In describing Claimant's condition, Plaintiff marked that he had problems in the area of his behavior with other people, specifically: showing affection to other children, taking turns,

---

[1] "R." refers to the Administrative Record, which uses continuous pagination and can be found at ECF No. 4. Dates cited here follow the ALJ's decision, but the Court notes some discrepancies in the dates used in the decision compared against the documents in the file.

2

playing board games. (R. 168.) She indicated on the report that Dr. Michael Nathan, who has been Claimant's pediatrician since birth, reported that he had diagnosed Claimant with ADHD. (R. 172.) At that time, Plaintiff reported that Dr. Nathan had prescribed Methylphenidate to "help… the child calm down." (R. 173.)

Also in November 2011, Dr. Michael Nathan filled out a "General Medical Report." He reported that Claimant, whom he had first seen on November 21, 2005, had ADHD. (R. 216-217.)

Cassandra Yarborough, Claimant's teacher, reported in November 2011 that Claimant suffered from a variety of behavioral problems that interfered with his own learning and the educational environment in general. She reported that Claimant was often "uncooperative" in class. (R. 178.) She observed that Claimant's "opposing behavior interferes with his academic progress" and that he "stubbornly refuse(d) to do his work. (*Id*.) Moreover, she indicated that Claimant had "a very serious problem," on a daily basis, with "working without distracting self or others." (R. 179.) If she confronted Claimant about his behavior, he would argue and mumble under his breath. (*Id*.) She also reported that Claimant was "constantly disturbing" the other students, which resulted in either not getting his own work done or doing a poor job on it. (*Id*.) Similarly, in her opinion, Claimant had "very serious" issues with "seeking attention appropriately," "following rules, and "respecting/obeying adults in authority." (R. 180.) She added that he "needs extra help to stay focused." (*Id*.) Ms. Yarborough also indicated that Claimant had "serious" problems "handling frustration appropriately," "identifying and appropriately asserting emotional needs," and "responding appropriately to changes in [his] own mood." (R. 182.) She further explained that Claimant had "trouble handling the classroom rules" and that his "mood" was "unpredictable" from one day to the next. (*Id*.) She opined that,

3

while Claimant was "not a violent child" but that he "often disrupts the class with noise, constantly dropping things (purposely) on the floor, playing instead of doing his work," and getting out of his seat and moving about the classroom. (*Id.*)

Ms. Yarborough reported that she only knew what Plaintiff told her about Claimant's medication. (R. 183.) From first-hand observation, however, Ms. Yarborough observed: "Jacere is much quieter on observation, but it is not a regular occurance [*sic*]." (*Id.*) She conjectured, however, that the medication Claimant was taking caused him to be "extra slow and loopy" and thus fail to perform better on the Dynamic Indicators of Basic Early Literacy Skills ("DIBELS") assessment test. (*Id.*) Ms. Yarborough reported that Claimant scored a 27 and that the benchmark is 25. (*Id.*)

2. Relevant Hearing Testimony

A first hearing took place in May 2013, sixteen months after Plaintiff filed for SSI on behalf of the Claimant. The hearing was limited to the testimony of the Claimant in order to give Plaintiff more time to develop the medical evidence. (R. 50, 55-56.) The ALJ asked claimant's age and confirmed that claimant knew what it meant to "tell the truth." (R. 51-52.) The ALJ also asked claimant his teacher's name, which claimant identified, and inquired whether he liked her, which was answered in the affirmative. (R. 52.) Next, the ALJ asked claimant if claimant was "always" good, to which claimant said "No." (R.53.) When the ALJ followed up and inquired if claimant was "sometimes" good, claimant agreed. The ALJ also asked if claimant listened to his mother, to which claimant replied "sometimes." (*Id.*) Next the ALJ inquired if claimant was working on that [being good], and claimant said, "I do it a lot." (*Id.*) When the ALJ asked Claimant about the number of his siblings, Claimant deferred the question to his

mother but then answered "one" when encouraged to respond himself). The ALJ concluded the conversation. (R. 53.)

A second hearing took place in September 2013, twenty-two months after Plaintiff filed her initial application. Plaintiff testified that she filed for SSI disability because Claimant had problems with his "behavior" since preschool, including "getting into fights, not "stay[ing] still," having "attention span" problems. (R. 32.) Plaintiff stated that she had hoped it would get better when Claimant started school, but it had not. (*Id*.) She stated that Claimant had problems with "behavior" with "(o)ther kids at school, the kids in the neighborhood and also his sibling, his brother." (*Id*.) When asked by the ALJ if Claimant had problems with adults, she described a situation the prior year "where he [the principal] had to chase him [Claimant] around the school." (*Id*.) Plaintiff also reported that, a "couple of months" after Claimant began kindergarten, she had been called into a meeting with his teacher and principal to discuss Claimant's inappropriate behavior at school. (R. 33-34.) At this meeting, Plaintiff was told that "without medication," Claimant would "not be able to function on the level" at which he is capable." (*Id*.) Plaintiff reported that these types of problems were continuing. (R. 34.)

Plaintiff also testified that she had spoken to Claimant's pediatrician, Dr. Nathan, who had treated him since Claimant's birth, about medication after the meeting with school officials. (*Id*.) According to Plaintiff, after telling Dr. Nathan about the meeting at school, they agreed to start Claimant on medication. (R. 35.) She further reported that none of the medications were successful at first due to side effects such as vomiting, loss of appetite, loss of weight. (*Id*.) Plaintiff reported that, in an effort to find a successful medication, Dr. Nathan experimented with different levels of Concerta and then Vyvanse. (*Id*.) Even when Claimant was in second grade and taking medication, Plaintiff reported that there were still problems with his behavior that led

5

to frequent phone calls from and interventions by school officials. (R. 35-38.) Claimant's behavior issues correlated with the time of the day, or as the ALJ phrased it, Claimant "was worse in the afternoon." (R. 37.) Plaintiff elaborated that the behavioral issues included "lifting up chairs," "distracting other kids," "not listening to kids or teachers," and generally "giving them a really hard time." (R. 38.)

In terms of Claimant's use of medication, Plaintiff testified that although she gives Claimant his medication at the same time each day, he does not always take it. (R. 38). Plaintiff noted that when Claimant does not take his medication, the school immediately calls. (*Id.*) She said that it was a little better since she got "hip to him stashing the medicine," but he still has what the ALJ terms "discipline problems," even with the medication. (R. 39.) She also reported that his behavior "doesn't last long" when Claimant is not taking his medicine. (*Id.*) Claimant confirmed with the ALJ that this usually meant that she'd be notified "by 11, 12:00" by the school, and she'd tell them that "we gave it [the medication] to him." (R. 40.) She reported that some of the variability in Claimant's behavior was attributed to changes in medication. Dr. Nathan had switched the medication because Nathan was losing weight. (R. 40.) Plaintiff testified that when Dr. Nathan had settled on a dosage that "worked" for Claimant, he became "stable" in terms of side effects but still had problems with disrupting the class and managing his behavior. (R. 41.) When asked to quantify the problems, Plaintiff estimated that the teacher sends a "weekly report" to her about Claimant's behavior that indicate that Claimant has problems about three school days out of five. (*Id.*) Plaintiff made a point of informing the ALJ that, on the day of the hearing, she been notified by the school about problems with Claimant's behavior. (*Id.*) She further reported that Claimant has been suspended from school several times. (*Id.*) In the first grade, he had been suspended four or five times. (*Id.*)

Plaintiff also reported that Claimant has progressed to the next grade level during the time period in question. (R. 36.) When questioned by the ALJ on whether Claimant had ever been held back, Plaintiff responded that he had not. (*Id.*)

Plaintiff reported that Claimant is under the ongoing care of his pediatrician, Dr. Nathan, and also sees medical staff at St. Joe's Clinic on an outpatient basis. (R. 42.) Although Claimant sees Dr. Nathan once a month so that the doctor can evaluate his condition before prescribing the next month's supply of medication, Plaintiff still takes him to St. Joe's approximately every 45 days. (*Id.*) The first time Claimant was treated by St. Joes, the school sent him after he threatened self-harm. (R. 43.) However, at the time of the hearing, Plaintiff reported that since January 2013, Claimant had seen the doctor at St. Joe's for follow-up visits after the initial incident and one more such appointment had been scheduled. (*Id.*) Claimant was also required to go to St. Joe's Clinic before returning to school. (*Id.*)

At the time of the hearing, Plaintiff reported that Claimant was generally in good health. He was taking two medications: Concerta during the day and a "nighttime pill." (R. 44.) Other than the behavioral issues, Plaintiff described Claimant as "a healthy little kid." (*Id.*)

## II.   STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Woody v. Sec'y of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988). It "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Pierce v.*

*Underwood*, 487 U.S. 552, 565 (1988) (citation omitted). Not all evidence is considered substantial. For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). It does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. *Monsour Med. Ctr. V. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (citing *Hunter Douglas, Inc. v. Nat'l Labor Relations Bd.*, 804 F.2d 808, 812 (3d Cir. 1986)). "[T]he district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)). A Court must nevertheless "review the evidence in its totality." *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)). In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" *Id.* (citing *Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988)).

A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record his reasons for rejecting or discrediting competent

8

evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)). If the ALJ fails to properly indicate why evidence was discredited or rejected, the Court cannot determine whether the evidence was discredited or simply ignored. *See Burnett v. Comm'r of Soc. Sec*, 220 F.3d 112, 121 (3d Cir. 2000) (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

### III.  APPLICABLE LAW

#### A.  The Process for Evaluating Childhood Disability

"In order to determine whether a child is disabled, the ALJ considers all relevant evidence including medical evidence, test scores, school records, and information from people who know the child and can provide evidence about functioning — such as the child's parents, care givers, and teachers." *Misavage v. Barnhart*, No. 01-1764, 2001 U.S. Dist. LEXIS 23329, at *16 (E.D. Pa. Nov. 30, 2001) (citing 20 C.F.R. § 416.924a(a)). The Third Circuit has explained that the Social Security Administration examines three requirements to evaluate whether a child is disabled, namely:

(1) that the child is not working;

(2) that the child had a "severe" impairment or combination of impairments; and

(3) that the impairment, or combination of impairments, was of Listing-level severity, meaning the impairment(s) met, medically equaled or functionally equaled the severity of an impairment in the Listings.

*T.C. ex rel. Z.C. v. Comm'r of Soc. Sec.*, 497 F. App'x 158, 160 (3d Cir. 2012) (citing 20 C.F.R. § 416.924(a)); *see also* 20 C.F.R. § 416.925. The Listings referred to in step (3) for child disability determinations are found at 20 C.F.R. § 404, Subpart P, Appendix 1.

The first requirement is self-evident.

On the second requirement, "[t]o determine whether a child's impairment(s) are medically or functionally equal in severity to an impairment contained in the Listings, the Commissioner assesses all functional limitations caused by the child's impairment(s)." *Pallens v. Colvin*, 2015 U.S. Dist. LEXIS 145208 (D.N.J. Oct. 26, 2015) (citing 20 C.F.R. § 416.926a(a)).

In turn, on the third requirement, "[t]o determine whether a child's impairment(s) are functionally equivalent to listed impairments, the Commissioner evaluates the effect of the child's impairment(s) in six domains of functioning." *Id.* (20 C.F.R. § 416.926a(b)(1)).

These six domains are:

(1) acquiring and using information,

(2) attending and completing tasks,

(3) interacting and relating with others,

(4) moving about and manipulating objects,

(5) caring for yourself, and

(6) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). The regulations set out that "[a]n 'extreme' limitation in one domain or 'marked' limitations in two domains renders the child's impairment functionally equivalent to a listed impairment under the Commissioner's regulations." *Id.* (citing 20 C.F.R. § 416.926a(a)). "A limitation is 'marked' when the impairment(s) seriously interfere with the child's ability to independently initiate, sustain, or complete activities." *Id.* (citing 20 C.F.R § 416.926a(e)(2)(i)). A marked limitation is more than moderate, but less than extreme. A limitation is "extreme" when the impairment(s) very seriously interferes with the child's ability independently to initiate, sustain, or complete activities. 20 C.F.R § 416.926a(e)(3)(i).

If the Commissioner answers each of the three requirements with a "yes" – then the child is considered to be disabled.

### B. The Requirement of Objective Evidence

Under the Act, disability must be established by objective medical evidence. "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [Commissioner] may require." 42 U.S.C. § 423(d)(5)(A). Factors to consider in determining how to weigh evidence from medical sources include (1) the examining relationship, (2) the treatment relationship, including the length, frequency, nature, and extent of the treatment, (3) the supportability of the opinion, (4) its consistency with the record as a whole, and (5) the specialization of the individual giving the opinion. 20 C.F.R. § 404.1527(c).

## IV. DISCUSSION

The issue before the Court is whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled within the meaning of the Act during the relevant time period. For the reasons below, the Court affirms the ALJ's decision.

### A. ALJ O'Leary's Decision

On October 9, 2013, the ALJ issued a decision denying Plaintiff's application, finding that Plaintiff was not disabled during the relevant time period. (R. 9-27.)

First, the ALJ determined that Claimant was a preschooler when the application was filed and is currently a school-age child. (R. 15.) Next, the ALJ concluded that Claimant did not engage in substantial gainful activity during the relevant time period. (*Id.*) The ALJ then determined that Claimant had the following severe impairment: Attention Deficit Hyperactivity Disorder. (*Id.*) At the next step of the analysis, the ALJ concluded that the Claimant does not

11

have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ noted that no treating or examining physician mentioned findings equivalent in severity to the listed impairments and that the evidence does not show "signs or findings that are the same or equivalent to those of any listed impairment." (*Id.*) The ALJ also indicated that "[p]articular scrutiny was given to the claimant's condition in light of Listing Sections 12.00 and 112.00." (*Id.*) In addition, the ALJ indicated here that "medications effectively control claimant's symptoms when compliant" and that "[n]o marked limitations are indicated." (*Id.*)

Finally, the ALJ discussed the totality of the record evidence and determined that the Claimant did not have an impairment or combination of impairments that functionally equaled the severity of the listings in 20 CFR 416.924a(d) and 416.926a because he did not have "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning. (R. 24.) The ALJ noted that his review includes "objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all settings (i.e., at home, in school, and in the community.)" (*Id.*) The ALJ then engaged in a lengthy discussion of the evidence in discussing the Claimant's ability to: (1) acquire and use information; (2) attend and complete tasks; (3) interact and relate with others; (4) move about and manipulate objects; (5) care for himself; and finally, (6) his overall health and well-being. (R. 15-24.) Specifically, the ALJ determined that Claimant had no limitation in moving about and manipulating objects and caring for himself, and further found that Claimant had less than a marked limitation in acquiring and

using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. (*Id.*) Ultimately, the ALJ reached a conclusion of "not disabled" because the ALJ did not find that Claimant had a marked impairment in two domains, as necessary.

> **B.  The ALJ's Determination That Plaintiff Was Not Disabled Within the Meaning of the Act is Supported by Substantial Evidence.**

Plaintiff argues that the ALJ erred in two respects. First, Plaintiff asserts that the medical equivalence analysis is "beyond judicial review" in that the ALJ makes "assertions – masquerading as actual 'step three findings' [that] are not explained, supported, or attributed to any evidence." (Pl. Br. at 6, 8-12.) For example, Plaintiff notes that the ALJ does not specifically mention or analyze Listing 112.11. (*Id.*) Second, with respect to the ALJ's functional equivalence findings, Plaintiff contends that the ALJ "cherry-picks" evidence to support "lay-conclusions" that the child suffers no impairments at all. (*Id.* at 12-14.) In essence, Plaintiff argues that the ALJ ignores the weight of the record evidence, and instead picks out bits and pieces that support the ALJ's own personal conclusion that Claimant is not disabled. Plaintiff further contends that the ALJ bases most of his conclusions on an 8-minute personal conversation with the Claimant and blames the mother for any symptoms not controlled by medications. (*Id.* at 7-8.) As a result, Plaintiff asks the Court to reverse the ALJ's decision, or, in the alternative, to remand for a new trial that follows the Commissioner's own regulations.

In opposition, Defendant argues that the decision of the ALJ should be affirmed. (Def. Br. at 9-14.) Defendant first notes the ALJ followed all steps in the three-step evaluation process to make the disability decision for the minor claimant. (*Id.* at 10, citing R. 12-24.) Defendant contends that the ALJ analyzed "the totality of the evidence" to determine that Claimant's ADHD "did not functionally equal the criteria of a listed impairment because he did not have

'marked' limitations in two domains of functioning, or an 'extreme' limitation in one domain of functioning." (*Id.* at 10, citing R. 25.) Defendant further argues that the ALJ is only required to analyze the evidence and provide a rationale for his decision. (*Id.* at 10.) In addition, Defendant points out both that ALJ was "entitled" to note his conversation with Claimant as part of the evidence and that there was "nothing improper" about their conversation. (*Id.*) Additionally, Defendant argues that Plaintiff did not provide any objective documentation at the hearing that would equal the criterion of Listing 112.11. (*Id.* at 9.) Defendant asserts that ALJ's non-mention of the listing by name was harmless.

The Court agrees with Defendant. The ALJ applied the correct law and his conclusions are supported by substantial evidence. As an initial matter, the Court does not agree that failure to specifically mention a specific Listing at Step Three is sufficient to warrant remand. *See Holloman v. Comm'r of Soc. Sec.*, No. 14-589, 2015 WL 1346167, at *2-3 (D.N.J. Mar. 25, 2015) ("The Third Circuit . . . 'does not require the ALJ to use particular language or adhere to a particular format in conducting his [step three] analysis.'" (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). Here, the ALJ specifically mentioned that he gave "[p]articular scrutiny" to Listings Section 12.00 and 112.00 in reaching his conclusion at step three, and there is nothing in the record to suggest that this statement is false. Indeeed, "the burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment[.]" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000). Here, however, Plaintiff fails to cite to particular evidence in the record to demonstrate that Claimant medically equals one of the listings. *See Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 162 (3d Cir. 2008) (noting disapprovingly that claimant failed to cite to "any record evidence demonstrating that her impairments are of Listing-level severity"); *Baker v.*

*The Hartford Life Ins. Co.*, No. 08-6382, 2010 WL 2179150, at *2 (D.N.J. May 28, 2010) *aff'd sub nom. Baker v. Hartford Life Ins. Co.*, 440 F. App'x 66 (3d Cir. 2011) ("It is not the Court's responsibility to comb the record on behalf of Plaintiff's counsel.")  More significantly, there is substantial evidence (or lack thereof) to support the ALJ's conclusion that Claimant's impairment did not meet or medically equal any of the impairments identified in the Listings. For example, to meet or equal Listing 112.11 (Attention Hyperactivity Disorder) requires that claimant present with a marked impairment in (a) age-appropriate cognitive/communicative function; (b) social functioning; (c) personal functioning; and (d) maintaining concentration, persistence, or pace. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.02B2.  In contrast, the ALJ noted that here "no marked limitations are indicated" and substantial evidence in the record (*e.g.*, that Claimant was in regular classes and his teacher documented no problems in nearly all areas of acquiring and using information (R. 178, 213-14)) supports this determination.

Likewise, with respect to functional equivalence, the Court finds that the ALJ's conclusion that Claimant does not have an impairment or combination of impairments that functionally equals the severity of the Listings is supported by substantial evidence.  As noted, the ALJ must consider six domains for this determination. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). "Extreme" limitation in one domain or "marked" limitations in two domains renders the child's impairment functionally equivalent to a listed impairment under the Commissioner's regulations. 20 C.F.R. § 416.926a(a)). As an initial matter, the Court notes that the ALJ walked through each of the required domains and that he specifically considered the limited record evidence in this case. (*See* R. 17-24.) The ALJ noted that Claimant is enrolled in regular education and was in second grade at the time. (R. 17.) The ALJ discussed Claimant's medication history, and he noted that Claimant was not brought back to the doctor for six weeks, despite 30 days being the

15

recommended timeframe. (*Id.*) The ALJ referenced Plaintiff's testimony, which included statements that Claimant was doing better with his medication. (*Id.*) Additionally, the ALJ noted Claimant's evaluation at St. Joseph's Regional Medical Center, where Claimant was again diagnosed with ADHD and continued on medication, and remarked that only one-follow up was documented in the record. (*Id.*) Further, the ALJ discussed Claimant's kindergarten teacher report, which he described as "inconsistent," and commented on his interaction with Claimant. (*Id.*) The ALJ then proceeded to discuss each of the required domains, and determined that Claimant had no limitation in moving about and manipulating objects and caring for himself, and further found that Claimant had less than a marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. (*Id.* at 18-24.) The Court finds that substantial evidence supports these conclusions. Although Plaintiff points to the classroom observations of Claimant's teacher to assert that the ALJ erred, the Court finds that the ALJ properly accounted for these observations and weighed them against the other evidence in the record, including evidence that Claimant's ADHD improved while on medication and that medical follow-up was lacking. (*See* R. 18, 216, 229.) Accordingly, the Court finds that substantial evidence supports the ALJ's conclusions.

## V.  CONCLUSION

For the foregoing reasons, the decisions of the Commissioner and the ALJ are affirmed. An appropriate order follows this Opinion.

DATED: 2/2/16

JOSE L. LINARES
U.S. DISTRICT JUDGE

16